HOUSTON AND TEXAS CENTRAL RAILWAY COMPANY v. J. P. KELLEY.

### No. 1489

1. **Contributory Negligence—Charge.**

See charges on contributory negligence held to sufficiently define it and state the penalty therefor, and to justify the refusal of charges requested by defendant which applied the law, so generally stated, more specifically to the facts and instructed against the doctrine of comparative negligence.

2 **Same.**

See charges on above subject held correct, and charges requested properly refused, illustrating the following principles; that the court having given a correct general charge on the subject might properly refuse more specific charges because they were an unnecessary repetition, and that the court, having given a correct general charge on the subject, was not bound to reform a requested special instruction containing error and give so much of it as was correct, though it applied the law more specifically to the facts than did the charge given. (The charge requested was held erroneous in that it directed a verdict for defendant, if plaintiff knew of a defect in cars causing the injury, when a verdict for plaintiff might properly have been rendered by the jury, based on grounds of negligence independent of such defect.)

3. **Same—Must Have Caused the Injury.**

See opinion for charge on contributory negligence correctly refused, because it did not state that the supposed negligence must have contributed to the injury, to defeat plaintiff's action.

4. **Same—Emphasizing by Repetition.**

See charge properly refused for same reason; and also because emphasizing by too much repetition.

5. **Master and Servant—Risks Assumed.**

See requested charge on servant's assumption of risk held properly refused, because it made the servant's knowledge of certain defects in cars, which rendered it dangerous to couple them while moving rapidly, an assumption of the risk, if the servant, injured in attempting to couple while so moving, had a right to control the speed of the train by signals. This was incorrect as applied to a case where there was evidence supporting the claim that the servant gave such signals but they were not acted on; it was improper to charge that the particular state of facts constituted an assumption of risk, and the charges already given fairly submitted the question.

6. **Charge—Abstract—On Evidence.**

The following charge on contributory negligence of a switchman injured in coupling cars was not erroneous because too abstract; and so far as it may have been on the weight of evidence, erred, if at all, in favor of defendant: "If the plaintiff knew, or could have known by the use of ordinary care and diligence, that to make the coupling under the circumstances then existing, and the condition of the cars to be coupled was unusually dangerous and hazardous, he would be guilty of contributory negligence, and you will find for the defendant."

**7.  Charge—Erroneous in Part.**

See charge on effect of pleadings alleging negligence held properly refused because it was erroneous in part, and the court was not bound to separate good from bad.

**8.  Negligence—Degree of Care.**

A charge that it is the duty of a railway company to those in its employ to exercise reasonable care in keeping its cars in safe condition, only requires the exercise of reasonable care by the company, and is not more onerous than the law demands.

**9.  Charge—Selecting Particular Facts—Assuming Facts.**

See charge—upon liability of a railway company for negligent injury to a switchman, by unsafe cars, improper loading or improper handling of cars—held, when considered, as it was required to be, in connection with the rest of the charge, to be not improper as submitting isolated facts, nor as selecting particular parts of the testimony to charge on, nor as assuming negligence in the matter of unsafe condition of cars, either as to construction or manner of loading, or in the matter of handling the cars, nor to be a charge on the weight of evidence.

**10.  Contributory Negligence—Burden of Pleading and Proof.**

The burden is on defendant to plead and prove plaintiff's contributory negligence unless it is prima facie shown by plaintiff's own pleadings or proof.  See case where an instruction that burden of proof was on defendant was held proper under this rule.

**11.  Injury to Servant—Fact Case.**

A switchman attempting to make a coupling of cars loaded with cotton projecting over the ends, so as to compel him to squat below floor of cars, gave stop signal to foreman, which was not obeyed and, the cars continuing to move after coupling, he was dragged under them and injured.  See opinion for facts held to sustain a recovery by the servant on account of defective drawheads, absence of deadwoods, improper loading and failure of foreman to repeat signal.

**12.  Damages—Personal Injury.**

See opinion for proof upon which a recovery of $10,000, as damages for personal injuries (including loss of leg), was sustained as not excessive.

APPEAL from District Court of Robertson.  Tried below before Hon. W. G. TALIAFERRO.

Plaintiff had judgment for $10,000.

The special charge No. 1, requested by defendant and refused, was of the nature in the first paragraph of the head-notes.  All other instructions given or refused and evidence material to an understanding of the points ruled are given in the opinion.

*Baker, Botts, Baker & Lovett,* and *Frank Andrews,* for appellant, filed briefs, the points urged sufficiently appearing in the opinion.

They cited, on the charges defining negligence, McDonald v. Railway, 86 Texas, 11; Railway v. Garcia, 75 Texas, 591; Railway v. Neff, 87 Texas, 307; Railway v. Trawick, 84 Texas, 73; Railway v. Sein, 87 Texas, 310.

On charges on contributory negligence, Henry v. Sansom, 2 Texas Civ. App., 153; Mayor of Houston v. Railway, 84 Texas, 594; Brown v. Pridgen, 56 Texas, 127; Smith v. Savings Bank, 1 Texas Civ. App., 124; Fox v. Brady, 1 Texas Civ. App., 594.

On the pleading as to negligence of True and Lallier, Sanchez v. Railway, 30 S. W. Rep., 431; Railway v. Arias, 30 S. W. Rep., 449; Railway v. Foreman, 73 Texas, 314; Railway v. Spicker, 61 Texas, 429;

Byers v. Carroll, 7 Texas Civ. App., 424; Harvey v. Cummings, 68 Texas, 607; Banking Co. v. Stone, 49 Texas, 4.

On instruction as to degree of care, Railway v. Huffman, 83 Texas, 290; Railway v. Bell, 75 Texas, 50; Railway v. Delahunty, 53 Texas, 212; Railway v. Doyle, 49 Texas, 198; Cooley on Torts, 557; Railway v. Brown, 75 Texas, 267; Railway v. Lyde, 57 Texas, 505; Railway v. McCarthy, 64 Texas, 635; Railway v. Oram, 49 Texas, 341; Dillingham v. Harden, 6 Texas Civ. App., 476.

On charge based on isolated facts, Smithwick v. Andrews, 24 Texas, 495; Nesbit v. Walters, 38 Texas, 577; Gaston v. Wright, 83 Texas, 285.

On charge assuming facts, Rev. Stat., art. 1317; Gay v. McGuffin, 9 Texas, 501; Golden v. Patterson, 56 Texas, 628; Ins. Co. v. Brown, 82 Texas, 634; Willis v. Hudson, 72 Texas, 608; Railway v. Crissman, 65 Texas, 374; Johnson v. Railway, 2 Texas Civ. App., 141; Railway v. Roberts, 2 Texas Civ. App., 111; Costley v. Railway, 70 Texas, 112; Railway v. Pennell, 2 Texas Civ. App., 128; Railway v. Brentford, 79 Texas, 625; Railway v. Kutac, 76 Texas, 478; Railway v. Nixon, 52 Texas, 26; Tel. Co. v. Edsall, 63 Texas, 675; Allen v. Pierson, 60 Texas, 606; McAninch v. Freeman, 69 Texas, 448; Kerlicks v. Meyer, 84 Texas, 158; Railway v. Echols, 7 Texas Civ. App., 433.

On court's charge, placing defense on contributory negligence and ignoring question of assumption of risk, Gaston v. Wright, 83 Texas, 285; Smithwick v. Andrews, 24 Texas, 495; Brown v. Pridgen, 56 Texas, 127; Nesbit v. Walters, 38 Texas, 577; Fox v. Brady, 1 Texas Civ. App., 594; Henry v. Sansom, 2 Texas Civ. App., 153.

On burden of proof of contributory negligence, Railway v. Crowder, 63 Texas, 503; Wood on Master and Servant, sec. 382; Pierce on Railroads 299, 382; Rorer on Railroads, 697; Wharton on Negligence, 426, 1053, 1175; Cooley on Torts, 673; Hinkley v. Railway, 120 Mass., 262; Mayo v. Railway, 104 Mass., 137; Crafts v. Boston, 109 Mass., 519; Railway v. Overall, 82 Texas, 248; Railway v. Burns, 71 Texas, 481; Railway v. Bartlett, 69 Texas, 83; Railway v. Hester, 72 Texas, 42; Hilliard on Torts, 134; Railway v. Murphy, 46 Texas, 363; Railway v. Allbright, 7 Texas Civ. App., 21; Railway v. Spicker, 61 Texas, 427; Beach on Cont. Negl., 432; Murray v. Railway, 72 Texas, 5.

On risks assumed by plaintiff, and sufficiency of facts to sustain a recovery, Railway v. Somers, 71 Texas, 700; Lovejoy v. Railway, 125 Mass., 79; Brassman v. Railway, 6 Atl. Rep., 226; Rogers v. Railway, 76 Texas, 505; Railway v. Bradford, 66 Texas, 734; Railway v. Harris, 2 Texas Civ. App., 542; Railway v. Tarver, 72 Texas, 312; Dallas v. Railway, 61 Texas, 201; Railway v. Faber, 65 Texas, 344; Railway v. Crowder, 65 Texas 503; Cooley on Torts, sec. 543 et seq.; Railway v. Somers, 78 Texas, 442; Railway v. Hester, 64 Texas, 403; Watson v. Railway, 58 Texas, 439; Railway v. Fowler, 56 Texas, 460; Pierce on Railroads, 379; Thompson on Negligence, 1008, sec., 15; Railway v.

Conrad, 62 Texas, 628; Railway v. Lempe, 59 Texas, 22; Wood on
Master and Servant, secs., 326, 349; Railway v. McNamara, 59 Texas,
258; Railway v. Lemon, 83 Texas, 146; Bonnet v. Railway, 31 S. W.
Rep., 525; Jones v. Railway, 31 S. W. Rep., 706; Railway v. French,
86 Texas, 96; Railway v. McKee, 29 S. W. Rep., 545; Manson v. Eddy,
22 S. W. Rep., 66; Fordyce v. Stafford, 22 S. W. Rep., 161; Eddy v.
Bodkin, 28 S. W. Rep., 825; Francis v. Railway, 28 S. W. Rep., 842;
Railway v. Denny, 24 S. W. Rep., 319; Railway v. Lasch, 21 S. W.
Rep., 563; Railway v. Wallace, 76 Texas, 637; Johnson v. Railway,
30 S. W. Rep., 95; Railway v. Hohl, 29 S. W. Rep., 1131; Railway
v. Montgomery, 19 S. W. Rep., 1015; Platt v. Railway, 51 N. W. Rep.,
254 (Iowa); Goddard v. McIntosh (Mass.), 37 N. E. Rep., 169; Howard
v. Railway, 41 Kan., 403; Brown v. Sullivan, 10 S. W. Rep. (Tex.),
288; Railway v. Myers, 55 Texas, 110.

They discussed at length the facts and rulings in the following cases:
Day v. Railway, 2 Am. and Eng. Ry. Cases, 127; Smith v. Potter,
2 Id., 142; Bajus v. Railway, 28 Id., 499; Railway v. Plunkett, 2 Id.,
127; Railway v. Brice, 28 Id., 542; Karrer v. Railway, 41 Id., 265;
Lothrop v. Railway, 41 Id., 327; Railway v. Husson, 12 Id., 244; Brice
v. Railway, 38 Id., 38; Railway v. Townsend, 21 Id., 619; Railway v.
Higgins, 21 Id., 629; Kelley v. Railway, 21 Id., 633; Darracutts v.
Railway, 31 Id., 157; Railway v. Gower, 31 Id., 168; Simms v. Rail-
way, 31 Id., 199; Railway v. Cottrell, 31 Id., 240.

*Cannon, Graham & Bishop*, for appellee, filed brief and argument
upon the assignments and propositions submitted by appellants.

As to the sufficiency of the petition to warrant the submission of the
issues in question, they cited, Railway v. Huffman, 83 Texas, 290; Rail-
way v. Woods, 24 S. W. Rep., 741; Railway v. Bell, 75 Texas, 50;
Railway v. Delahunty, 53 Texas, 212; Railway v. Doyle, 49 Texas, 198;
Cooley on Torts, 557; Railway v. Nix, 23 S. W. Rep., 328.

As to the liability of the railway for the acts of Lallier, as its vice-
principal, Railway v. Shieder, 30 S. W. Rep., 902; Railway v. Scott,
27 S. W. Rep., 827.

That the damages were not excessive, Railway v. Randall, 50 Texas,
260; Railway v. McClain, 80 Texas, 99; Railway v. Porfert, 72 Texas,
353; Railway v. Dorsey, 66 Texas, 148; Railway v. Garza, 62 Texas,
285.

COLLARD, ASSOCIATE JUSTICE.—Suit for damages by appellee
against appellant for personal injuries. Verdict and judgment for
plaintiff below, from which defendant has appealed.

*Findings of fact.*—Kelley was employed in the yards of the railroad
company at Hearne, Texas, as a switchman. He was well informed as
to his duties, and a good switchman. While in the discharge of his
duties as switchman, he was injured in coupling cars to such an extent
that his leg had to be amputated about midway up the thigh. He was
twenty-three years old at the time of the injury, was a strong, vigorous

and healthy young man, and was receiving $75 per month for his services as a switchman. The company had received at Hearne cars loaded with cotton, among them two flat cars loaded with uncompressed cotton. They were so loaded that the cotton extended over the sides and ends of the cars. It was not usual, or the ordinary way of loading cotton, to let the ends extend so far over as these did. The company had an inspector at Hearne whose duty was to inspect the cars when they arrived there, and they have a man to adjust and arrange the loads. It is the duty of an employe called the porter to do this. If a bale was slipped out he would prize up the other cotton and push the bale that projected out back to its place. The loading of the cotton on the cars in question had not been so adjusted, and when the two cars came together the cotton so projecting over the ends of the cars made it dangerous to make a coupling between them in an erect position. In such case the switchman would have to squat under the cotton and make what is called a "squat" coupling. The danger would be in getting mashed between the projecting bales of cotton. The drawheads on these two cars were of an old pattern rarely used; were too narrow, and more dangerous to operate than the kind generally used, and the cars were not provided with deadwoods, as they should have been to prevent the cars from coming close together when being coupled.

One Fred Lallier was the company's general yardmaster on the yard, directing the movement of the cars. He had charge of this business, and had control of the switchmen, and power to employ and discharge them. Plaintiff was in position to couple these two cars, facing north; Lallier was next to him on the north, and between Lallier and the engine was another switchman. There was a bend in the train, consisting of some twenty or twenty-four cars, so that plaintiff could not see the engineer so as to signal him directly, but had to signal Lallier, whose duty it was to transmit the signal to the engineer or the next switchman. In this position Kelley, being ordered by Lallier to make the coupling of the two cars, signaled the cars to slow up and stop, so that he could make a stop coupling. The cars were approaching fast, and he, Kelley, did not have time to notice any danger from the projecting cotton, and did not see the defective drawheads until he stepped in between the cars to make the coupling. He did not notice that the cars were improperly loaded until he got in between them, because they were coming rapidly. When he got between the cars he saw he would have to make a "squat" coupling to keep out of the way of the projecting cotton. This he did, but after the cars were coupled they moved on, and he was compelled to remain under the cotton, and he was knocked over and caught on to the axle of the car to save himself and keep from being run over. He was dragged from a half car length to one hundred feet, and while being dragged his leg was caught under the wheels and mashed so that it had to be immediately amputated. The testimony tends to show that Lallier did not repeat the signal to stop the cars for the coupling. If he gave any signal it was only the slow-up signal, and not the stop signal.

The petition charges and the evidence tends to show that it was his duty to cause the train to stop for the coupling, whether plaintiff signaled him to do so or not, and that the failure to so have the train stopped for the coupling was a cause contributing to the injury. Under the court's charges the jury also must have found that the defendant was negligent in failing to provide proper coupling apparatus, in failing to have the cars properly loaded, and that the cars were driven too rapidly together for a coupling of the kind, which failures were negligence chargeable to defendant, contributing to plaintiff's injuries. The jury also found, under the court's instructions submitting the issues to them, that plaintiff was not guilty of negligence contributing to his injuries, and that his injuries were not the result of a risk assumed by him in his employment. We think the testimony sustains the verdict.

The court, at request of defendant, instructed the jury not to consider as elements of negligence any failure on the part of Lallier to repeat any stop signals which Kelley may have given him, because there is no allegation in the petition charging the same to be negligence; "and," the charge says, "if you believe that Kelley did give a stop signal to Lallier, and Lallier failed to repeat the same, it could not be considered as a basis or grounds for recovery against defendant." The jury found negligence in other matters, as pleaded and shown by the facts, contributing to plaintiff's injuries, on the part of defendant, which we think was a correct finding; at least we cannot say that it is the duty of this court to declare that the verdict should be set aside for want of testimony to support it on the issues.

The most important questions presented by appellant are addressed to the court's charge, and the refusal of the court to give to the jury charges requested by the defendant. We will therefore set out the charges given by the court in full, to prepare us for a proper consideration of the charges asked and refused. The charge begins by explaining the issues of the pleadings, and the court told the jury that plaintiff's petition declared he had "sustained certain injuries set out which were caused by the negligence of defendant and of its servants and agents." "That the negligence consisted, (1.) of the improper manner in which the cars which were being coupled by plaintiff were loaded.

"(2.) Of the unsafe and defective arrangement and appliances on said cars for coupling the same.

"(3.) The failure on the part of defendant's said yardmaster to communicate the signals made by plaintiff to the engineer in charge of defendant's engine, and thereby properly direct the movements of the train.

"(4.) The rapid and violent manner in which the defendant's said yardmaster caused the train of cars attached to said engine to be driven against the car which plaintiff was attempting to couple to said train."

Defendant denies generally the allegations made by plaintiff, and specially pleads: "(1.) That the injuries received by plaintiff, if any, were caused by his own carelessness and negligence, and that he could have

avoided the danger to which he was exposed and prevented such injuries if he had exercised ordinary care and prudence.

"(2.) That plaintiff's injuries, if any, were caused and sustained through the ordinary risks incident to the service in which he was engaged, and that, in accepting such service and employment of defendant, he assumed such risks.

"(3.) That the dangers to which plaintiff was exposed were incident to his said service and well known to him. That the manner in which said cars were loaded, the manner of their construction, the drawheads attached to same, and their condition, and all the affairs with .which plaintiff had to deal in coupling said cars, were well known to him at the time, or could have been known to him by the use of ordinary care.

"(4.) That the cars which plaintiff was coupling at the time of his alleged injuries were in good condition and equipped with the latest improvements to prevent danger and accidents and loss of life and limb; and that they were properly loaded, and if not properly loaded, the defendant had no knowledge of it; and that the plaintiff knew it, and it was his duty to report the same to defendant's officers and agents.

"Negligence is a question of fact, solely for the jury to determine, and is defined to be the absence of that degree of care and diligence which persons of ordinary prudence and skill would usually exercise under the same circumstances.

"Ordinary care is such care as a person of ordinary prudence and caution would exercise under the same circumstances.

"Contributory negligence is not only negligence on the part of the party committing the injury, but is also negligence on the part of the party who is injured.

"The plaintiff is not entitled to recover for his injuries, if any, unless the defendant has been guilty of negligence as herein defined, in some one or more of the particular acts or omissions alleged in his petition and set out in this charge, and he cannot then recover if he has been guilty also of contributory negligence, as herein defined and explained, and the negligence on the part of defendant, if any, must have been the direct and proximate cause of plaintiff's alleged injuries.

"It is the duty of a railroad company towards those in its employ, to exercise reasonable care in keeping the cars in its possession and use in a safe condition, both as to the construction and the loading of same; and if it fail to use such care, and an injury thereby results to an employee while in the discharge of his duties, said railroad company would be liable for such injury, unless such employe knew of the unsafe condition of said cars, or could have known of the same by the use of ordinary prudence .and care, and could have avoided the injury by the exercise of ordinary prudence and care.

"It is also the duty of an employe of a railroad company to use reasonable care and caution to prevent injury to himself; and if he, by his own carelessness, contributed to the injury, or might, by the ex-

ercise of care such as prudent men generally would have used under the same circumstances, have avoided the injury, he cannot recover.

"It is likewise the duty of a railroad company to exercise ordinary care in the conduct and movement of its trains.

"If the jury believes from the evidence that the plaintiff, while in the employment of defendant and in the performance of his duties, was injured as alleged, and that said injuries were caused by the negligence of the defendant, its officers or agents, and that said negligence consisted in the unsafe condition of its cars, by reason of the manner in which they were loaded or constructed, as before explained, or in the manner in which its train was managed and moved, or of either or all of said causes, you will find for the plaintiff, unless you further find from the testimony that he was guilty of contributory negligence, as herein explained, and could have avoided such injury by the exercise of ordinary care and prudence, in which event you will find for the defendant.

"If the jury believe from the evidence that neither the plaintiff or defendant was guilty of negligence, or that both were guilty of negligence, and that each contributed approximately to the injury, you will find for the defendant.

"If the plaintiff knew, or could have known by the use of ordinary care and diligence, that to make the coupling, under the circumstances then existing and the condition of the cars to be coupled, was unusually dangerous or hazardous, he would be guilty of contributory negligence, and you will find for the defendant.

"The burden of proof is on the plaintiff to show that the injuries of which he complains were caused by the negligence of the defendant, its agents or officers, and unless he has done so by a preponderence of evidence, you will find for the defendant. If this has been shown to your satisfaction, the burden of proof then shifts upon the defendant, and it devolves upon the defendant to show that it is not liable for damages by reason of the contributory negligence of the plaintiff as heretofore charged.

"If you find for plaintiff, in determining the amount you believe he is entitled to recover, you will take into consideration his loss of time, the character, extent and permanency of his injuries, his impaired capacity, if any, to earn money or pursue an occupation, the physical and mental pain you believe he has endured as a consequence of such injuries, and the expense of medical attention necessary for his cure, etc., and you will allow the plaintiff such reasonable and actual damages as will compensate him for the injuries you believe he has received.

"The facts proven, the weight of the evidence, and the credibility of the witnesses are exclusively for the jury.

"If you find for plaintiff, so state, and state the amount you so find. If you find for defendant, so say and no more."

The court also gave the following charge requested by defendant: "If you should believe from the evidence that the cars which the plaintiff

was attempting to couple at the time of the accident were negligently loaded by the defendant, as alleged in plaintiff's petition, and you should further believe that the plaintiff knew the manner in which they were loaded, or by the exercise of ordinary care could have known the same, and should further believe that the manner in which they were loaded was the direct or proximate cause of the injury to plaintiff, you are charged that he cannot recover, and you will find a verdict for the defendant."

The court also gave the following charge requested by the defendant: "The defendant requests the court to give the jury the following special charge: 'If you believe from the evidence that the cars that the plaintiff was coupling at the time of the accident were negligently constructed in regard to drawheads, the absence of deadwoods, handholds and stirrups, as alleged in plaintiff's petition, and you should further believe that such negligent construction of said cars was the cause of plaintiff's injury and you should further believe that the plaintiff knew, or by the exercise of ordinary care could have known, the manner in which said cars were constructed, and that the manner in which the said cars were constructed was the direct or proximate cause of the injury, you are charged that plaintiff cannot recover, and you will find your verdict for the defendant.' "

The court also gave the following charge, requested by defendant: "The defendant requests the court to give the jury the following special charge: 'You are charged that the plaintiff assumed the risks ordinarily incident to the duties of his employment with the defendant; you are also further charged that he assumed the risk of such unusual dangers or hazards as were known to him, or as he might have known by the exercise of ordinary care; and if you believe from the evidence that the plaintiff was injured in the performance of a duty ordinarily incident to his employment, or that he was performing a duty the dangers of which were greater than usual in his said employment, and that he knew of such dangers, or by the exercise of ordinary care could have known the same, he is not entitled to recover in this case, and you will return a verdict for the defendant.' "

The court also gave the following charge requested by defendant: "The defendant requests the court to give the jury the following special charge: 'If you believe that the plaintiff was guilty of any acts of negligence, that is to say, in the discharge of his duties he failed to exercise such care as an ordinarily prudent person would have exercised under the same circumstances, and you should further believe that such negligence on the part of the plaintiff contributed to his injuries and was the direct or proximate cause thereof, if any, you are charged that on account of such negligence he is not entitled to recover in this case, and you will return a verdict for the defendant.' "

The court also gave the following charge, requested by defendant: "The defendant asks the court to give the jury the following special charge: 'If you should find for the plaintiff in this case, under the in-

structions given you by the court, in assessing his damages you will fix it at such an amount as will reasonably compensate him for the pecuniary loss suffered, taking into consideration the loss of his leg, his other injuries and suffering, amount paid out in doctor's bills, if any, and his diminished capacity to earn money, if any. You cannot consider any but elements of actual damages, and can only give him a reasonable pecuniary or money compensation for whatever injuries you may find that he actually sustained.' "

The court also gave the following charge, requested by defendant: "'The defendant asks the court to give the jury the following special charge: 'You will not consider as elements of negligence any failure on the part of Lallier to repeat any stop signal which Kelley may have given him, because there is no allegation in the petition charging same to be negligence; and if you believe that Kelley did give a stop signal to Lallier, and Lallier failed to repeat same, it could not be considered as a basis or grounds for recovery against defendant, because not pleaded.' " On all these issues submitted to the jury, they found for plaintiff, and as the testimony sustains the finding, we conclude that the facts existed in favor of plaintiff, as referred to in the charges and as found by the jury.

*Opinion.*—1. The court's charge, in defining negligence and contributory negligence, is not subject to the objections made to it by appellant's assignment of error. It was clearly the law. The court repeatedly instructed the jury as to the "penalty" of contributory negligence on the part of plaintiff, that he could not recover if his own negligence contributed to his injuries. The charges asked by defendant, and refused, upon this subject, did not more properly or clearly present the law, and there was no error in refusing such requested charges."

2. Appellant requested the court to instruct the jury, "If you believe from the evidence that the cars which plaintiff was attempting to couple at the time of his injury were negligently constructed and negligently loaded, and you should further believe that such negligent construction and negligent loading, or either of these causes, was the direct or proximate cause of the injury to plaintiff, and you should further believe that the plaintiff knew how the cars were loaded and constructed, or could have known the same by the exercise of ordinary care, and that the same was the direct and proximate cause of his injury, you are charged that he cannot recover, and you will return your verdict for the defendant." The court refused the charge, and appellant assigns the refusal as error. It was held, in the case of Railway v. Sheider, 88 Texas, 166, 167, that where the court had given a general charge as to contributory negligence, and a requested charge was correct in part only, the court was not bound to reform defendant's special charge and give the part of it that was correct. The court, in this case, read to the jury as the law of the case, defendant's special charge No. 2, as to the negligent loading of the cars, and plaintiff's knowledge of the same, or that he should have known of it, and told the jury that if they so found the facts, he could not re-

cover, and to find for defendant; and he also, in general terms, instructed the jury in his charge, that plaintiff could not recover if his own negligence contributed to his injuries. Such being the case, we do not think the requested charge now under consideration should have been given, repeating what had already been given; besides, there was error in the requested charge. It would have told the jury that if they found negligent construction of the cars and negligent loading as the proximate cause of the injury, and plaintiff knew of the same, or ought to have known it, that he could not recover, thus ignoring other grounds of negligence which might have warranted a recovery, as the failure of Lallier, defendant's vice-principal, to repeat signals of plaintiff both to slow up and to stop the train for the coupling, and the rapid movement of the cars, which the jury might have concluded was the cause of his being run over and carried along with the train until he was hurt. The charge asked was not restricted to the effect of the negligence stated; but directed the jury, if they should find such facts, to return a verdict for the defendant, thus excluding from their consideration other facts of alleged and proved negligence that may have been a direct and proximate cause of the injury—a cause without which the injury would not have occurred. Railway v. Shuder, supra; Railway v. Simmons, 33 S. W. Rep., 1101, 1102; Railway v. Ormond, 64 Texas, 489; Murray v. Railway, 73 Texas, 7. There was no error in refusing the charge.

3. Defendant asked the court to instruct the jury: "If you believe, from the evidence, that plaintiff walked in between the rails, in between the cars which he was attempting to couple, with his foot between the rails, and his back or side turned toward the approaching train, and attempted to make a "squat" coupling, which was dangerous, after he had become aware of or ascertained the approaching train, and after he had become aware of and ascertained the condition in which the cars were loaded, and you believe such conduct on his part was negligence, you are charged that he cannot recover, and you will find a verdict for the defendant."

This charge was incorrect, because it does not tell the jury that the negligence, if so found, must have contributed to the injury, or have been a contributory cause of it, and it was correct to refuse it.

4. The court refused a requested charge, asked by defendant, as follows, which is assigned as error: "If you believe from the evidence that the defendant's cars, which the plaintiff was attempting to couple, were negligently loaded, and that the plaintiff discovered the same in time to have avoided the injury by the exercise of ordinary care, and that after he had so discovered their condition, he attempted to couple the same by squatting, and you believe such act on his part to be negligence, you will return a verdict for the defendant." The charge was not the law. It is subject to the same objection as the one just considered. It improperly directs the jury to find for defendant, if they find the negligence submitted, whether it contributed to the injury or not. The court had, besides the general instruction that plaintiff

could not recover, if he had been guilty of contributory negligence, which contributed to his injuries, given a requested charge of defendant as to the negligent loading of the cars, and plaintiff's knowledge of it, which is again repeated in the charge now being considered. This repeating of the same matter in requested charges, asking it separately, and then again in connection with another fact, and again in connection with still another, is not the proper manner of submitting the facts to the jury. It gives the fact too much prominence in the charge, and is calculated to improperly influence the jury.

5. Error is assigned to the refusal of the court to give the following requested charge for defendant: "You are instructed that, if you believe from the evidence that the plaintiff in this case, J. P. Kelley, on or about the date alleged in his petition, undertook to make, and did make, what is known as a squat coupling, and the said character of coupling was voluntary upon the part of plaintiff, and not required by the rules of the defendant company, and if you further believe that said character of coupling was unusually dangerous and hazardous, and that the plaintiff knew that the same was unusually dangerous and hazardous, and if you further believe that the plaintiff had the right to signal and require the engineer to so handle said train as to lessen the danger of coupling to a minimum, then you are advised and instructed that the plaintiff undertook and assumed the risk or danger incident to his conduct, and if his injury was received solely and alone by reason of his making said squat coupling, under the circumstances hereinbefore described, then, in such event, you will find for the defendant." This charge should not have been given. It makes him assume the risk, if he knew of the danger and had the right to reduce the danger by signaling proper directions to the engineer, whether he so signaled or not. Suppose, as the testimony tends to show, he signaled for proper management of the train, and in this did all he could do to make the coupling safe, he could not be held to have assumed the risk as it would have been without such signals. The charge is erroneous, because it makes his assumption of the danger depend upon his right to signal so as to minimize it. We have copied in the foregoing the charge of the court and requested charges given as asked by defendant, and by reference to them it will be seen that the court instructed the jury as fairly as could be asked for defendant as to risks assumed by plaintiff in his employment. We do not think the court should have attempted, as was asked in the refused charge, to tell the jury that the particular facts mentioned, under the circumstances, would constitute a risk assumed by him in his service.

6. Appellant says the court erred in the following paragraph of the general charge: "If the plaintiff knew, or could have known, by the use of ordinary care and diligence, that, to make the coupling under the circumstances then existing and the condition of the cars to be coupled was unusually dangerous and hazardous, he would be guilty of contributory negligence, and you will find for defendant." We are at a loss to

understand what objection could be taken by the defendant to this charge. If it is erroneous at all, the error is in favor of defendant, because it informs the jury that if plaintiff knew of the danger and he made the coupling with such knowledge, or if he ought to have known it, the act would be contributory negligence, for which the jury should find for defendant. Appellant argues that it is the duty of the court to charge on the facts without charging on the weight of the evidence, and that the charge is abstract. We think the charge is on and applicable to the facts, and in so far as it is on the weight of evidence, the error is against the plaintiff and in favor of defendant.

7. Defendant asked the court to give the following charge, which was refused: "You are charged, in this case, that the plaintiff can only recover upon proving the material allegations in his petition to be true; he cannot recover on account of negligence of True in failing to transmit to the engineer proper signals in proper time, nor can he recover on account of the failure of defendant's employes to promptly stop the train, because there are no allegations in his petition charging these things as negligence, and you will not consider the same in determining your verdict."

The petition contains the following: "That said switching was done by the plaintiff and the said True and the said engineer and fireman. That plaintiff and True passed signals, intended to direct the movement of the engine handling said train and cars, while they were being switched and coupled by plaintiff and said True, to him the said Lallier, yardmaster as aforesaid, who was then and there present, and undertook to correctly repeat and give every signal and sign to the engineer in charge of said engine, directing him in the handling thereof and in handling said train and cars. That said Lallier, while the said two flat cars stood apart, ordered, commanded and directed plaintiff to couple them together; that the plaintiff then had no time to inspect said cars or either of them, nor was it his duty so to do; but under the command of the said Lallier he proceeded to make said coupling; that he gave a signal to the said Lallier, to be by the said Lallier repeated to the said engineer, directing the said engineer to place said flat cars together slowly and with caution; that the signal is known as a slow signal; that plaintiff relied on Lallier repeating the same to the engineer as he had given it to him, the said Lallier; that he has since learned and now charges that Lallier did not repeat the slow signals to the engineer, but in lieu gave said engineer a fast or Buzzard signal, and caused said engineer to throw said flat cars together with great speed and force, the plaintiff being between said cars; that though vigilant, cautious, prudent, and watchful he was unable to discover the rapidity with which they were coming together until they were so close that he was unable to make his exit from between them, and dropped below the floor of said flat cars and below the cotton thereon to protect himself; that on account of the aforesaid defective and unsafe drawheads, in the absence of deadwood, and the manner in which the said bales of cotton extended

over the ends of the said flat cars, and the way they came together, the bales of cotton on each of said flat cars jamming and striking together, the plaintiff was compelled to and did dodge and stoop down between said flat cars, to keep from being crushed beneath them. That while in this position, which he had to assume to protect himself from being mashed by the cars coming together as aforesaid, the said train of cars did not stop or slack their speed, but were driven on by the engineer, by the order of said Lallier. That the plaintiff, being unable to get out because of the cars being moved so rapidly and violently, was caught and knocked down by one of the flat cars; he was run over, mutilated, crushed, and was dragged about fifty yards. That plaintiff's right leg was cut off midway of his thigh. That it was the duty of the said Lallier to have had the said train and cars, when they ran together for the purpose of making a coupling, stopped, and especially in this case, he being at the time but a short distance away from where the plaintiff was knocked down, run over, and injured. That he could, by the use of the least degree of care, have seen the perilous and dangerous condition and attitude in which the plaintiff was when said cars came together, and he should have had them stopped at once. Plaintiff alleges that he did not do so, and, failing to do so, that he was guilty of negligence and carelessness and caused plaintiff's injuries."

By the foregoing we see that the petition does charge failure of defendant's employe, Lallier, alleged to be a vice-principal, to properly stop the train, and this failure is shown to be negligence which caused the injury. The charge asked, instructing the jury to the contrary, was erroneous and should not have been given, and the court was not required to separate this part of the charge from the other part, and give the latter, as to True's negligence in failing to repeat signals. The court in the general charge gave substantially the remainder of the charge asked. Railway v. Sheider, 88 Texas, 152, et seq.

8. Appellant objects to the following paragraph of the court's charge, because it is contended that it makes it the duty of defendant to keep its cars in a safe condition, while its only duty is to use ordinary care in providing its cars and loading the same. The charge is as follows: "It is the duty of a railroad company towards those in its employ to exercise reasonable care in keeping the cars in its possession and use in a safe condition, both as to the construction and the loading of same, and if it fail to use such care and an injury thereby results to an employee while in the discharge of his duties, said railroad company would be liable for such injury, unless such employe knew of the unsafe condition of said cars, or could have known of the same by the use of ordinary prudence and care, and could have avoided the injury by the exercise of ordinary prudence and care." The court's charge only requires defendant to use reasonable care to the end that its cars shall be safe. This is not more onerous than the law demands. Railway v. Hufman, 83 Texas, 289; Railway v. Kirkland, 32 S. W. Rep., 591, and authorities there cited.

9. Appellant complains that the court erred in the following para-graph of the general charge: "If the jury believe from the evidence that the plaintiff, while in the employment of defendant and in the per-formance of his duties, was injured as alleged, and that said injury was caused by the negligence of its officers or agents, and that said negli-gence consisted in the unsafe condition of its cars, by reason of the man-ner in which they were loaded or constructed, as before explained, or in the manner in which its train was managed and moved, or of either or all of said causes, you will find for the plaintiff; unless you further find from the testimony that he was guilty of contributory negligence as herein explained, and could have avoided such injury by the exercise of ordinary care and prudence, in which event you will find for defendant." One objection made to this part of the charge is that the court should not charge the jury that if certain isolated facts exist, they should find for the plaintiff, but should submit for their consideration all the facts reasonably arising from the testimony. We do not believe the charge is subject to the objection made to it. It is not obnoxious to the rule that the court should not select particular parts of the evidence of lia-bility and charge upon it. It is quite general, and presents several phases of the case in a general way, making defendant liable in case plaintiff was not guilty of contributory negligence. The charge, as a whole, should be read in connection with its parts. So read and under-stood, it is not objectionable as stated. Another objection made to it is that it assumes that the condition of the cars was unsafe, both as to loading and construction, and that the train was unsafe in the manner in which they were constructed and it was managed, and is a charge upon the weight of evidence. The questions were left to the jury.

Another part of the charge asked by defendant and given by the court (special charge No. 9) instructed the jury fully as to assumed risks, pointedly informed the jury as to the law of risks assumed by plaintiff, and plainly told them that he could not recover for such risks. It would be unfair to the court's charge to construe particular clauses of it and condemn it because it failed to meet every question at issue in one clause, when the question omitted is fully presented in a distinct charge given upon the subject.

10. The appellant assigns as error the following paragraph of the court's charge: "The burden of proof is on the plaintiff to show that injuries of which he complains were caused by the negligence of defend-ants, its officers and agents, and unless he has done so by a preponder-ance of the evidence, you will find for the defendant. If this has been done to your satisfaction, the burden of proof then shifts upon the de-fendant, and it devolves upon the defendant to show that it is not liable for damages by reason of the contributory negligence of plaintiff as herein charged."

The facts do not show, as alleged or proved, a prima facie case of negligence on the part of plaintiff, or negligence at all, and he did not have the burden of acquitting himself of fault. Defendant relied upon

his contributory negligence to defeat the case he made, and the burden of proof was upon it to establish the defense.

Prior to the case of Railway v. Sheider, supra, there was some confusion in the law in this State, and difficulty in determining what the law should be as applied to particular cases upon the subject. But the opinion of Justice Denman in that case has relieved the subject of its subtleties and furnishes us with a plain and just rule, easy to be applied. The general rule he declares is that the burden of proof is upon the defendant on the issue of contributory negligence. But the rule is subject to exceptions. "First," he says, "where the legal effect of the facts stated in the petition is such as to establish prima facie negligence on the part of plaintiff as a matter of law, then he must plead and prove such other facts as will rebut such legal presumption." The opinion then proceeds to give reasons for this. "Second," he says, "where the undisputed evidence adduced on the trial establishes prima facie, as a matter of law, contributory negligence on the part of plaintiff, then the burden of proof is upon him to show facts from which the jury, upon the whole case, may find him free from negligence; otherwise the court may instruct a verdict for defendant, there being no issue of fact for the jury." Applying the law as announced in that case to the case before us, where neither by the petition nor the facts is there a prima facie case of contributory negligence as a matter of law or fact shown to exist on the part of plaintiff, it must be held that the charge under consideration is not incorrect as to the burden of proof.

Negligence was shown as alleged by plaintiff on the part of defendant, and we approve the verdict finding that plaintiff was not guilty of contributory negligence.

11. In reference to several assignments of error challenging the verdict, we believe it is supported by the testimony on every issue; that the danger to which plaintiff was exposed and from which he was injured, was the result of defendant's negligence as alleged by plaintiff, and that he was not guilty of any negligence contributing to his injury; that the risk was not one incident to his employment, and was not assumed by him in the discharge of his duties; and that the verdict should not be set aside by this court upon the ground that it is excessive.

Plaintiff testified: "At Hearne the Houston & Texas Central Railroad Company have yards, switches, side tracks, etc. They had a man in charge of the yard, named Fred Lallier, at Hearne, and he was called general yardmaster there. There were also men working in the yard under him, who were called switchmen. The duty of the yardmaster was to make up trains, keep the station in order, hire and discharge hands; and all of them worked under him. It was his duty to be present, and he was usually there. He was there on December 14, 1893, and was yardmaster at that time. I was there at that time, and was switching under Mr. Lallier. He was there in the yard when I was hurt, and in the same part of it that I was. He was superintending and managing things in the yard. Mr. True and myself were the

switchmen. It was G. W. True. The engineer's name was John Lipscomb, who was pulling the train with switch engine; and Mr. Pete Griffin was firing the engine. There were flat cars in the train loaded with bales of cotton, and also some box cars, but they were sealed, and I don't know what was in them. The bales of cotton were not compressed, and weighed about five hundred pounds each, and there were from forty to sixty bales on each flat car. The cotton extended over the sides and ends of the car, and were three tiers high. This was not the usual or ordinary way of loading cotton, that is, the tiers were all right, but it should not have extended out over the ends so far. The cars were fastened one to the other with links and two pins; there was nothing between the cars that held them apart, except drawheads. I was hurt on that occasion. I lost my leg and got my left heel hurt, and the scar is still on my heel. I was making a coupling between two flat cars loaded with cotton when I got hurt. They were brought in there from the north in freight trains. The company have crews running trains besides the yard men; yard men don't run trains. The drawheads that held these cars together were what are called the 'old-fashioned 34-inch drawheads,' which are the smallest that are made. There is also deadwoods between some cars, but there was none between these cars. I was railroading prior to this time, and understood these things. They were not the usual kinds of drawheads in use, the difference in them being that the others were larger, and longer, and wider at the mount, and received deadwoods, and these 34-inch drawheads would not receive deadwoods on the cars. The deadwood is about two feet long, is on the end of the cars with the drawheads underneath, and is bolted on each end of every car, and should be; but these small 34-inch drawheads can't use deadwoods. The deadwoods keep the cars from coming together and mashing a man. These cars had drawheads, but no deadwood. I was there to couple these cars, and got hurt. When the cars came together to be coupled, the drawheads hit underneath and the cotton hit above me, because the cotton projected over the ends of the cars. I was higher than the lower edge of the cotton, and had to stoop down to keep it from striking me.

"I was hurt in the day time, about 4:15 or 4:20 in the evening. Mr. Lallier was there and commanded us to handle and make up the train. I was in his employment. There was a slight curve on part of the track. In my position the engineer could not see a signal from me, and I gave him (Lallier) both a slow and a stop signal. When I saw the cars coming, I gave him the stop signal. The cars did not stop. The cars were all in motion, that is, I was to couple those that were coming to those that were standing still. I was standing kinder sideways to the cars coming up. I was not afraid of those coming up, for I thought my signal would be obeyed. I could not tell how fast they were coming. I first gave a slow and then a stop signal. The cars did not stop nor slacken, but came together very hard, and the result was that they pushed the other cars on and ran over one hundred feet, about three car lengths.

This was all after I had given my signals to Lallier. When the cars came together, they struck very hard. When I saw that the cotton projected over the end of the flat cars, I dropped underneath and kept them from mashing me to death. The reason that I did not get out is because the cars were too close together and I could not, after I discovered how they were loaded and my danger. The train knocked me over. If the train had stopped after they came together I would not have been knocked down. After I had been knocked down, if they had obeyed my signals, I could have gotten out. When the car struck me it kept going, and I went with it about a car length, and it then cut off my limb, and I was dragging under the car holding to the axle from the time I was knocked down until the time when the cars stopped. I cried out and took my wounded limb and lifted it around and crawled out myself. Mr. Lallier came there afterwards. He was about four or five car lengths from me when I gave him my signals, and he was in full view of me, too. The signals were for the guidance of the engineer. The reason I wanted him to get the signals was so that I could make the coupling without any danger.

"The Houston & Texas Central Railroad Company has an inspector at Hearne, whose duty it is to inspect the cars when they come there. Mr. Phillip Riley is the inspector now, and was at that time. They have a man to adjust and arrange loads also, and the porter at the freight depot is the man to do this. It was not my business to inspect the drawheads nor the loading of the cars. My business was to make couplings, set brakes and let them off, and do as commanded, and I was called a switchman in the yard. I got my leg cut off, and of course suffered great pain from it. The result was that it made me very nervous, and hurt me in many ways. I was confined to my bed and room for about six months. I have lost all the time since I got hurt from work, and was, up to the time I got hurt, earning about $75 per month, and had been earning about the same amount up to the time of this accident. Before that time I had been hearty and healthy, and very active. At the time of the injury I lacked from December to February of being twenty-three years old: I lost a great deal of blood and strength, and weighed one hundred and fifty pounds when I got hurt, and when I got able to weigh myself, I weighed just seventy-four pounds. In addition to the physical pain it affected my mind, and I am nervous and am very easily excited. I was able to run and walk as other men before I was hurt but can't do so now. During the time that I was confined to my bed at times I would know everything. I was in a hopeless condition, both physically and mentally—my mind was not very good. In regard to the loss of my limb, of course, the effect on my mind is great—it worries me a great deal as to how I am going to make a living—how to support my family. My prospects for making money now are not so good, and my prospect for a living is gloomy. I have no prospects of making money now. My leg is cut off about four inches above my knee joint. The limb, at the place where it was cut off, was sore five

months after it was hurt, and from that cause I have suffered continuously, and at the end of five months I have had pain from that. The deadwood on some cars projects some beyond the end of the cars. I don't remember the name of the drawheads that were generally in use at that time, but they were not like the ones on the flat cars, the difference being that the others were larger and longer than these. These small drawheads that I speak of were dangerous to couple. In coupling them it was more dangerous to couple with two together than with one. I did not see the kind of drawheads until the cars came together. I was standing by the side of the stationary cars, and cotton projected over the ends of the cars. I could not see the drawheads. The car had been standing there to make this coupling and I had just reached it. There was no brace or handbolt on these cars, as there usually is, and ought to be, but there were none there. I discovered that the cotton projected over just as the cars approached me, and just had time to drop down. I was standing with my left side to the track. In my position I saw the approach of the cars, but could not see with what rapidity the cars were coming at that time."

Cross-examined by counsel for defendant, witness says: "At the time I was injured I was an experienced brakeman. I had had a good deal of experience. I commenced work for the Houston & Texas Central Railroad Company on May 26, 1892, as switchman in the yard, and I have also worked for the L. & N. Company. I worked for the L. & N. Company for two or three months as special, and after that I had a regular job. The L. & N. Company is the Louisville and Nashville Railroad Company. I don't remember how long I worked for them, but I think it was about twelve months. I had no experience prior to that time. After leaving the L. & N. Company, I went to work for the Houston & Texas Central Railroad Company, and have never worked for any other roads. I was brakeman on the L. & N. road. It was not exactly the same kind of work as that of a switchman, but I was called upon to couple cars and make up trains. Before my injury in 1893, I was in the employ of the Houston & Texas Central Railroad Company. I never received any injuries while employed with the L. & N. road. I had been hurt once or twice before I got my leg cut off, I think. I think it was the second injury when I got my leg cut off. Before the loss of my leg, I had my arm and hand mashed by a cross-tie in the yard. I was also caught between the cars once and got my hand or finger mashed. This was when I was coupling box cars.

"The tracks in the yards at Hearne run north and south. The train was running north that caused my injury at the time I was making the coupling. I was facing northwest you might say; one of my feet was on the inside of the track and one on the outside. Going north my right foot was on the right hand side of the track. I was facing northwest, with my left foot on the inside of the rail and my right foot on the right hand side of the track. The car near me and to which I had to couple the others was stationary. The cars were not all loaded with cot-

ton, and there were other cars there besides the flats.  We had between fifteen and twenty cars in the train, and some of them were boxes and some not loaded with cotton.   I don't know what was in the box cars, as they were sealed up.   We had other cars coupled on the train, other than the flats loaded with cotton.   There were some more cars on the track and belonged to same train, but were not coupled on at that time. The distance between where I was standing and the engine was about twelve or fourteen car lengths; that is my best memory.   The cars between me and the engine were not all loaded with cotton, and there were some of them box cars.   I don't know how many boxes there were between me and the engine, but there was more than one.   There was no pilot on the engine.   The engine was headed north.   The engine being headed north, the engineer was on the right hand side of it.   The fireman was in the cab of the engine, and on the left hand side.   When I approached the stationary cars, I tried to make the coupling, and in fact did make it.   The pin was in the stationary car, but I did not see it until I got up to it.   The link was in the cars that were approaching. I got the link in the proper position in the drawhead and made the coupling.

"I don't recollect to what road the cars belonged, or to what cars they were; that is, the initials of the cars.   I know that the flat cars were loaded with cotton, and that is about all that I know with regard to the cars.   The coupling that I was forced to make is what is called a 'squat coupling,' and I made it.   The squat coupling has to be made where the cotton or lumber on a flat car projects out over the end of the cars, and you have to squat down under the cotton, and below the bottom of the flat car, and reach up and place the link in the proper position in the drawhead.   By bringing your head below the bottom of the flat car, you can reach up and make the coupling, and which is called the squat coupling.   At that time my head was just below the bottom of the flat car, and the cotton was above me.   There was not space enough, between the cotton on the two flat cars that came together, for my head.   I was not hurt by being mashed on my head, but was struck on my back.   I don't know what kind of a signal Mr. Lallier gave the engineer, but I gave Mr. Lallier the stop signal.   I don't know whether I made this statement in my petition or not.   My left heel was also caught by the flange of the wheel and hurt, and has the scar on it now.   It was mashed by the flange of the wheel, on the right hand side of the car going north— this is right, to the best of my recollection.   I first held on to the car for a brace, but after I was knocked down, I caught around the axle with both hands and held on to it.   I never tried to hold on to the drawheads.   The stirrup is used for climbing off and on the cars, and for a brace in making couplings.   The reason that I made the coupling while the car was in motion is, that I thought that my stop signal would be obeyed, because I gave it to Mr. Lallier.   When I gave the stop signal, had just reached the standing car.   I was standing close to the cars that were standing still, and just before I went in to make the coupling.   I

could not tell whether my stop signal was going to be obeyed until I had made the coupling, and it was then too late to get out, and the cars struck with such force that it knocked me down.   The train was moving tolerably fast when I gave the stop signal.   My side was to the approaching train—my left side.   My face was northwest, and back southeast. My back was turned partly to the approaching train.   The track was a little curved at the end where I was injured, but it is a very slight curve. The train was on the sidetrack and southeast of the freight depot building.

"Immediately after the injury, I think that I hallooed once or twice. After the cars stopped, Mr. Lallier came up to where I was, and I suppose that he heard me when I hallooed.   I was first carried to the freight depot, where my leg was amputated, and from there to my home, from which place, the next day, I was removed to the hospital at Houston. I was carried to the Houston & Texas Central hospital, located at Houston, Texas, and maintained by them; but it is kept up by the employees of the different railroads running into Houston.   I remained at the hospital from December 15, 1893, until February 20, 1894.   I looked and saw the kind of drawheads while I was coupling the train. I was holding to the corner of the car.   The drawheads used on these cars were the 34-inch drawheads.   The difference between the 34-inch drawhead and others is, that the size is different, the 34-inch drawheads being the smallest kind used, and the mechanism of them is different; the new ones receive deadwoods, and the 34-inch does not.   These cars were never equipped with deadwoods and would not receive them. They are not built for deadwoods, and they can't be used on them.   I mean by the 34-inch drawheads, that they are the smallest kind in use, and are almost out of use.   I don't know where the 34-inch comes in, and don't know why they are called 34-inch drawheads, but they are known as the 'old-fashioned 34-inch drawheads.'  I don't know the kinds used by other roads at that time.   The deadwoods are put on cars to protect men when they are making couplings.   I don't know what the distance between cars is when running and when standing, but suppose that it is about two or three feet.   I don't know exactly how far the drawheads extend beyond the ends of the flat cars, but suppose that it is about six or eight inches.   The reason I could not discover how fast the cars were coming, the cotton extended out over the ends of the cars.

"The drawheads are set down below the top of the flat cars; don't know exactly how far, but guess about six inches.   The cotton was not resting on the drawheads.   There was nothing to prevent me from seeing the drawheads, if I had stooped down and looked, for the cotton did not touch them.   I could see under the cotton after I had stooped down and looked.   The deadwoods do sometimes strike each other, but not if the drawheads do not break.   The deadwoods are put on cars to prevent the cars from coming together and hurting a man when he is making a coupling.   They don't protect a man unless the drawheads break, but they keep the cars from coming quite so close together when they strike each

other. I don't know that they would have done me any good if they had been on these cars, not with the cotton loaded as it was, and so I don't suppose that the absence of the deadwoods contributed to my injuries. I don't know how long the handbolts have been in use on flat cars. The reason that I did not wait for the cars to come together and stop, before making the coupling, is that I supposed that my stop signal would be obeyed as usual, and that they would come together slowly. I was standing just on the outside of the track and close to the standing cars, when I gave the stop signal, and had also given a slow signal before I gave the stop signal. I was on the outside, with reference to the rails. The link was in the approaching cars and the pin in the stationary flat car. I was injured after I had made the coupling.

"I don't know how many different kinds of drawheads the Houston & Texas Central Railroad use; but know they have more than one kind. I don't know the names of them. They have other drawheads besides the thirty-four and thirty-nine inch. They have one that the boys call the 'Jenny' drawhead, but I don't know the proper name for them. I don't remember whether any of these cars had the Jenny drawheads on them or not; or whether there were any except the thirty-four inch, I don't know. I had been switching that day from 6:30 in the morning up to the time I was injured, which was about 4:15 or 4:20 in the evening. I had been switching, I suppose, some fifteen, twenty or twenty-five minutes on this particular train before I got hurt. I don't remember how many couplings that I had made on this train before I got hurt, but my recollection is that we had the train about made up, and that there were only three more couplings to make, and Mr. Lallier told me to make them; and I made two of them, and went to make the other one, when I received the injury, just before making the last, or, rather, while I was making it. I don't remember exactly whether it was the last coupling that I was making when I received the injury or not. I can't be positive as to that. I don't know whether I made the first coupling on this train or not; there were others making couplings on the train at the same time. When Mr. Lallier was close, he would make a coupling, and Mr. True would make the couplings that were close to the engine. I was working in the field, as they called it. I had not been instructed by Mr. Lallier, or any one else, to keep my feet on the outside of the track when making a coupling, and did not know that there was any danger in putting my feet on the inside of the track. I saw other switchmen put their feet on the inside of the rails. A man can't well make a coupling without putting his feet, or one of them, on the inside of the rails. After I saw that the cotton extended out over the ends of the flat cars, I saw that I would have to make a squat coupling. I can't say that I know that kind of a squat coupling is the most dangerous to a switchman. I have heard a great many brakemen say that these drawheads were very dangerous. From my own knowledge and experience, the squat coupling I consider a dangerous one to make to some extent. I don't know whether there is any coupling more dangerous or not. The

projecting or overhanging cotton makes it more dangerous than otherwise in making other kinds of a coupling.

"I was facing northwest when I gave my last two signals. My back was then partly to the approaching train. Mr. Lallier was to my back at that time, and four or five car lengths from me, and on the same side of the track that I was on. I was standing on the right hand side of the track when I first gave a slow and then a stop signal with both hands. I did not place the link in the approaching train, and don't know who did. The length of the link pins that we were using on that day was about twelve inches, I suppose, and that is the usual length of pins. When placing the pin in position to make a coupling, you place it in a leaning position, and when the car strikes the drawhead it sends it home. The jar of the train knocks the pin in a horizontal position, and it then drops in the hole in the drawhead and completes the coupling. The link used in coupling cars is about the same length of the pin; that is, about twelve inches long. I would say that the space between the top of the drawhead and the bottom of the projecting cotton was about the length of a pin. The pin will sometimes hold the cars together, even if it does not go clear through the drawhead. The size of the hole in the drawhead, where the pin goes through, is about two inches in diameter. The pin is about two and a half or three inches in circumference. It takes up most all the space in the hole when it is in, but there is space enough left for it to work well. I think that I know how I was hurt; I went to make the coupling, and did make it, and was bending down under the extending cotton when I got hurt. I got in that position in order to keep the cotton from mashing me when the cars came together. It was a necessary position on my part, because I had to do so in order to make the coupling, and I was commanded to make the coupling. I could not see how fast the cars were coming, but it was coming right fast. I don't know how fast it was coming, and can't explain it to the jury so that they can understand it.

"The two parts of the train, to the best of my recollection, were about one or two car lengths apart, or maybe more. I know of my own knowledge that I was struck by the train and carried three car lengths. I was carried two car lengths after I was hurt. I don't think there was anything on the track except the flat cars. There would have been no occasion for them to have stopped the train if they had not known that I was hurt. The train would have stopped before it did if the signal that I gave them had been obeyed. It is customary, when a man makes a coupling, for the train to stand still until the man making it comes out and gives a signal to go ahead. The force with which the cars come together always moves the stationary cars a little, but if the train is running slow, it hardly moves the standing cars. I don't know whether Mr. Lallier saw me give the stop signal or not, as I had my back to him when I gave it, and did not see him when I gave it, but supposed he saw it. I know how I was injured, and what caused it; it was caused by the way the cotton was loaded, and from the fact that the train did not stop

at the proper time.. I was hurt by the wheels coming in contact with my leg. Had I been standing erect, I would have been mashed by the cotton. I did not know that the cotton projected over the ends until I got right up to it. I passed by it prior to that, but did not pay any attention to it. There was nothing to have prevented me from seeing, if I had noticed it when I passed. I could have seen it, if I had looked for it. When I first saw the train approaching, there was nothing to have prevented me from getting out of the way, if I tried; but I had given the stop signal, and thought it would be obeyed; but there was nothing to prevent me from getting out, if I had tried. I was not between the rails when I first saw the trains approaching; there was nothing in my way except the cotton above me. I was on the right hand side of the drawheads, and near the right rail.

"When I was making the coupling one of my feet was on the inside and one on the outside of the rail. My left foot was between the rails. There would not have been any trouble if the train had stopped at the stationary cars, except the projecting cotton. There would not have been any danger in the cotton if the train had been standing still. I was not scared until the cotton was over me, and would not have been scared if I had not thought there was some danger. I don't think there would have been any danger if the cars had been standing still. The life of a switchman is considered dangerous by all who engage in it. I recollect that the cotton was not compressed, but flat. It was in December that I was hurt. The Houston & Texas Central Railroad had handled a good deal of cotton that season. I made couplings every day. This was about the best season in the year for business for the road. During the month of April is the best season for handling stock, but during the fall we handle more cotton than at any other time. I don't remember how many bales of cotton there was on each car, but there is ordinarily from forty to sixty bales on each car, and three tiers. The lower tier is loaded by placing bales lengthwise, and some across the car. It frequently happens that the cotton projects out over the ends and the sides of the flat cars, but it was not customary to load it in that way. The porter at the freight depot usually adjusted the cotton on the cars when it came to Hearne. A bale would sometimes slip out a little and the porter would prize up the other cotton and push the bale that projected out back to its place. I did not often make couplings like this; for the cotton did not always project over like it did on this car, and I did not recognize it this time until it was too late. I should think that it was dangerous to make couplings like this, or under the same circumstances.

"My mind was perfectly clear on that day. My present weight is about one hundred and thirty-two or one hundred and thirty-three pounds. My general health is bad, and my appetite is also bad. Sometimes I am unable to be up, and I am sometimes confined to my bed. I sometimes eat nothing for several days. I was not cautioned by any one in the yard, or any one at all, that it was dangerous to make a squat

coupling, and in fact was never told that in my life. I don't recollect whether there were any Houston & Texas Central, Morgan Line, International & Great Northern or Galveston, Harrisburg & San Antonio cars in this train or not, or what kind of cars were in the train. I don't remember whether there were more than eleven cars composing the train or not; I could not tell the number of cars in the train."

Plaintiff, being re-examined by his counsel, says: "The hospital that I was placed in was maintained by the employees of the Houston & Texas Central Railroad Company. I contributed to this hospital fifty cents per month. They kept this amount out of my wages every month. All the employees of the Houston & Texas Central Railroad Company, as far as I know, pay this fifty cents per month. In my position the stationary cars were in front of me, and the track to my left, and I had my back turned partly to the approaching cars. [Illustrated his position with reference to the track, the stationary cars and the approaching cars to the jury.] Mr. Lallier was south of me. I came from Mr. Lallier to where I was. Mr. Lallier told me in person to make the coupling. He was about four or five car lengths from me when I made the coupling. There was nothing between me and him. He was there to receive signals from me and repeat them to the engineer. There was a curve there, and in my position the engineer could not see a signal that I might give him. When a man went in to make a coupling, with or without a signal, it was the custom to stop the cars, and it was their duty to wait until he appeared and give them a signal to go ahead. They did not stop or wait for me to reappear and give them the signal to go ahead. I was working under the yardmaster's orders. During my sickness I had a doctor to attend me. I owe Dr. Pugh two hundred dollars. Dr. Boyles and Dr. Stewart waited on me while I was at the hospital in Houston."

We cannot say that the verdict is not supported by the evidence, or that it is not warranted by the evidence on all the questions submitted to the jury as to negligence, assumed risk and the amount of damages. Railway v. McClain, 80 Texas, 85; Railway v. Porfert, 72 Texas, 353; Railway v. Randall, 50 Texas, 259; Railway v. Dorsey, 66 Texas, 148; Railway v. Garcia, 62 Texas, 286. The case made by the petition is sustained by the proof, and finding no error committed on the trial, as assigned by appellant, we find no ground of reversal, and the judgment of the lower court is affirmed.

*Affirmed.*

Delivered March 18, 1896.

Writ of error refused.

### ON MOTION FOR REHEARING.

COLLARD, Associate Justice.—Our finding that there were from twenty to twenty-four cars in the train, as shown in previous findings filed with original opinion, is a mistake, and we correct the same to read

from eighteen to twenty cars in the train. The finding will not, however, change any of the conclusions arrived at by the court. We cannot change any other findings of fact, as we believe, in view of the verdict and the facts in evidence, our previous conclusions of fact are correct, and we adhere to them. We do not think the motion for a rehearing should be sustained, and the same is overruled.

*Overruled.*

Delivered May 13, 1896.